IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IN RE FEDERATED MUTUAL FUNDS         )        2:04cv352
EXCESSIVE FEE LITIGATION             )        Electronic Filing

### MEMORANDUM ORDER

AND NOW this 30th day of September, 2009, upon due consideration of the defendants' Motion to Dismiss and the parties' submissions in conjunction therewith, IT IS ORDERED that [153] the motion be, and the same hereby is, denied.

It is well-settled that in reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "[t]he applicable standard of review requires the court to accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the non-moving party." Rocks v. City of Philadelphia, 868 F.2d 644, 645 (3d Cir. 1989). Under the Supreme Court's decision in Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 561 (2007), dismissal of a complaint pursuant to Rule 12(b)(6) is proper only where the averments of the complaint plausibly fail to raise directly or inferentially the material elements necessary to obtain relief under a viable legal theory of recovery. Id. at 544. In other words, the allegations of the complaint must be grounded in enough of a factual basis to move the claim from the realm of mere possibility to one that shows entitlement by presenting "a claim to relief that is plausible on its face." Ashcroft v. Iqbal, – U.S. –, 129 S. Ct. 1937, 1949 (2009) (quoting Twombly, 550 U.S. at 570).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. In contrast, pleading facts that only offer "'labels or conclusions' or 'a formulaic recitation of the elements of a cause of action will not do,'" nor will advancing only factual allegations that are merely consistent with a defendant's liability. Id. Similarly, tendering only "naked

assertions" that are devoid of "further factual enhancement" falls short of presenting sufficient factual content to permit an inference that what has been presented is more than a mere possibility of misconduct. Id. at 1949-50; see also Twombly, 550 U.S. at 563 n. 8 (A complaint states a claim where its factual averments sufficiently raise a "'reasonably founded hope that the [discovery] process will reveal relevant evidence' to support the claim.") (quoting Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 347 (2005) & Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 741 (1975)).

This is not to be understood as imposing a probability standard at the pleading stage. Iqbal, 129 S. Ct. at 1949 ("The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."); Phillips v. County of Allegheny, 515 F.3d 224, 235 (3d Cir. 2008) (same). Instead, "[t]he Supreme Court's Twombly formulation of the pleading standard can be summed up thus: 'stating ... a claim requires a complaint with enough factual matter (taken as true) to suggest the required element ... [and provides] enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element.'" Phillips, 515 F.3d at 235; see also Wilkerson v. New Media Technology Charter School Inc., 522 F.3d 315, 321 (3d Cir. 2008) ("The complaint must state 'enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element.'") (quoting Phillips, 515 F.3d at 235) (citations omitted). "Once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." Twombly, 550 U.S. at 563.

Plaintiffs' Consolidated Amended Complaint ("CAC") reflects a metamorphoses of the claims originally presented in the consolidated actions, with the phoenix emerging as a "pure excessive fee" case under section 36(b) of the Investment Company Act of 1940, 15 U.S.C. § 80a-1 et seq. ("the Act"). See James N. Benedict, Sean M. Murphy, C. Neil Gray and Robert R. Miller, *Recent Developments in Litigation Involving Mutual Funds and Investment Advisers*, 1732 PLI/Corp 943, II(A) (January 16, 2009). Defendants' motion seeks to derail the claim

based on two basic premises: this court should follow the approach reflected in Judge Easterbrook's opinion in Jones v. Harris Assoc.s., L.P., 527 F.3d 627 (7th Cir. 2008) and adopt that approach as the controlling benchmark needed to state a claim for excessive fees under the Act; and dismiss the CAC for failure to state a claim under the pleading standards as recently construed by the Supreme Court.  We decline to embark on such an adventure.

    The approach set out in Jones appears to miss the forest for the trees.  Section 36(b) of the Act does not impose a fiduciary duty solely on the process leading to the adoption of a fee agreement for a mutual fund's investment advisor; it imposes a fiduciary duty on the "receipt of compensation" for such services and "payments of a material nature" to such advisors and their affiliates.  This focusing of the duty on compensation was directly attributable to Congress' concern about establishing safeguards to counter the conflict of interest in mutual fund fee arrangements that are inherent in the organization of a typical mutual fund.  See Green v. Fund Asset Management, L.P., 286 F.3d 682, 685 (3d Cir. 2002).   Ill equipped or not, the import from section 36(b)'s focus on the receipt and payment of compensation does place responsibility on the judiciary to assure investment company advisors comply with their fiduciary duty in both "determining and receiving their advisory fees."  Id.   "Mutual funds are a component of the financial services industry, where abuses have been rampant."  Jones v. Harris Assoc.s., L.P., 537 F.3d 728, 730 (7th Cir. 2008) (Posner, J., dissenting from denial of rehearing en banc).  Against this backdrop a standard that holds that "a fiduciary must make full disclosure and play no tricks but is not subject to a cap on compensation  compensation," Jones, 527 F.3d at 632, seems to us to consider only half the equation: the process that leads up to section 36(b)'s main focus.   In this jurisdiction a breach that only involves the process leading to the setting of a fee arrangement but does not result in damages in the form of generating improper fees falls short of what is needed to prevail under section 36(b).  Green, 286 F.3d 686 (a showing of actual damages is necessary to prevail on a claim that an improper or invalid fee agreement has been set).  And reducing section 36(b) to a review of only whether

the adviser has made full disclosure in the process leading to a fee arrangement would promote "a safe harbor of exorbitance, for under such a view an adviser's fiduciary duty would be diluted to a simple and easily satisfiable requirement not to charge a fee that is egregiously out of line with industry norms." Gallus v. Ameriprise Financial, Inc., 561 F.3d 816,823 (8th Cir. 2009).

     Moreover, the notion that the mutual fund market is sufficiently regulated by the volume of funds and individual investors' ability to "vote with their feet" seems to suggest that the standards imposed by the Act as previously construed by the United States Supreme and the Second Circuit have become outdated and are no longer needed in today's world of financial and corporate governance.  But it is difficult to understand how an investor who suddenly finds him or herself gouged by a fee extracted in violation of section 36(b)'s fiduciary duty on compensation has been made whole under Congress's remedial scheme because he or she has made a move to lessen the degree of the harm inflicted.  Similarly, the notion that the competition created by thousands of mutual funds "remain[s] superior to a 'just price' system administered by the judiciary," Jones, 527 F.3d at 633, fails to provide any remedial protection against the inherent conflict(s) which section 36(b) was designed to counter and indorses the proposition that the noncompetitive component of market can adequately police itself because virtually all mutual funds are subject to similar forces when it comes to their captive relationship with their advisors.  Congress thought otherwise.  And we are not at liberty to declare section 36(b)'s mandate no longer effective or only partly necessary.

     Defendants also advocate a pleading standard that is too demanding.  Twombly as further clarified in Iqbal did not convert the standards governing pleadings under Rule 8 into those governing Rule 56 motions.  All that is necessary is that a plaintiff set forth enough factual matter to show the claimed entitlement to relief is plausible on its face and there is a reasonable expectation that discovery will produce evidence to support the claim.  Against this benchmark defendants' insistence that the CAC must provide more details and specifics is

misplaced. Proving fraud is not a component of a section 36(b) claim and therefore the heightened pleading standards of Rule 9(b) are not brought into play.

Moreover, the CAC sets forth sufficient factual matter to make the claim of entitlement plausible of its face and a create a reasonable expectation that discovery will produce evidence sufficient to support the claim. "In order to determine whether a fee is excessive for purposes of Section 36(b), a court must examine the relationship between the fees charged and the services rendered by the investment adviser." Krantz v. Prudential Investment Fund Management, LLC, 305 F.3d 140, 143 (3d Cir. 2002) (quoting Migdal v. Rowe Price-Fleming Int'l, Inc., 248 F.3d 321, 330 (4th Cir. 2001) (citing Gartenberg v. Merrill Lynch Asset Mgmnt., Inc., 694 F.2d 923, 928 2d Cir. 1982) (to violate Section 36(b), "the adviser-manager must charge a fee that is so disproportionately large *that it bears no reasonable relationship to the services rendered*") (emphasis added in Migdal)). Non-exclusive factors that have been considered pertinent in undertaking such a review include: "(1) the nature and quality of the services provided by the adviser; (2) the profitability of the mutual fund to the adviser; (3) the extent to which 'fall-out' benefits inured to the adviser; (4) the economies of scale realized by the adviser; (5) the fee structures of comparable funds; and (6) the independence and conscientiousness of the board of directors." Gallus, 561 F.3d 821 (citing Gartenberg, 694 F.2d at 928-31). In addition, "reliance on other fees throughout the industry will not satisfy § 36(b) because of the competitive defects of the mutual fund market." Id. (citing Gartenberg, 694 F.2d at 929).

Plaintiffs allege and seek to establish that the advisory fee charged to the Federated Kaufmann Fund of 1.425 percent of average net assets per annum, which when reduced to a fee of approximately 1.275 percent of average net assets per annum after certain voluntary expense waivers are instituted, is unreasonable, excessive and/or disproportionate to the services provided, is not indicative of the fee that would be produced by arm's-length bargaining, has not been produced from a fair process, and violates the provisions of Section 36(b). CAC at ¶

5. Plaintiffs have alleged that the Federated Fund Complex is one of the larger mutual fund complexes in the United States. CAC at ¶ 13. The Kaufmann Fund is one of 49 equity mutual funds in the Federated family of funds. CAC at ¶ 74. Its size has grown from $3.4 billion in assets in 2001 to $11.8 billion as of October 31, 2007. CAC at ¶ 74. Its assets constituted approximately 32 percent of Federated Investors Inc.'s ("FII") total equity mutual fund assets and approximately 23 percent of all of FII's equity assets at the close of 2006. CAC at ¶ 74.

Between 1986 and April of 2001, the Kaufmann Fund was managed by Edgemont Asset Management, Inc., a private investment adviser that had no other funds under its supervision. Edgemont charged the Kaufmann Fund an investment fee of 1.5 percent for the services of portfolio management, research and fund administration, with no break points. This was considered to be a high fee for a domestic equity fund. CAC at ¶¶ 38-43. In 2001, the Kaufmann Fund was reorganized into the Federated Kaufmann Fund, bringing it within the management of defendants. The investment advisory fees were kept at the old rate, even though the fees charged to most equity mutual funds in the Federated Fund Complex ("FFC") for the same type of services was .75 percent and none of these funds had anywhere near the amount of assets under management. CAC at ¶¶ 44-46. The trustees did not engage in meaningful negotiations regarding the setting of the Kaufmann Fund's advisory investment fee or consider the reduced overhead costs of investment management operations that would flow from the reorganization and placement of the Kaufmann Fund under defendants' management. CAC at ¶¶ 47-49.

In the years that followed five separate equity funds which were originally organized with different investment objectives and philosophies were merged into the Kaufmann Fund. Each of these funds had considerably lower investment advisory fees and poorer performance records. Findings were made by the Board that the mergers would be beneficial to the shareholders of one of the smaller funds, but in no case was a determination made that the mergers would be beneficial to the existing shareholders of the Kaufmann Fund. These

mergers resulted in the Kaufmann Fund absorbing portfolios that were not necessarily consistent with its own investment approach, incurring brokerage commissions when selling these securities and increasing the investment advisory fees and profits being realized by the Federated Defendants while reducing their expenses in operating and managing the combined assets. CAC at ¶¶ 55-63.

The Board of Directors or Board of Trustees for the mutual funds in the FFC are comprised of the same fourteen individuals, eleven of whom are identified as independent. This group of directors/trustees oversees more than 140 mutual funds in the Federated Complex. CAC at ¶ 66.  These individuals do not hold separate board meetings for each separate mutual fund.  There has been no presentation of information to the Board pertaining to the justification for the separate fees charged to each particular fund within a particular fund complex, the profitability of each fund in light of its size and advisory fee, what efforts have been made to determine whether economies of scale might be available for larger funds that could be passed on to fund shareholders, or whether the adoption of breakpoints should or should not be implemented for any of the funds under management. CAC at ¶ 71. Furthermore, the Board admittedly does not consider each investment contract for each fund independently or separately, but instead bases its decision to approve an advisory contract based on a totality of relevant circumstances, with a view to past and future long-term considerations.  CAC at ¶ 72.  This approach results in the overall cost structure and profitability of many funds being considered in the aggregate rather than whether the advisory fees for any particular fund are in line with other similar funds within and outside the FFC. CAC at ¶ 73.  This approach has the ability to mask the fact that a large fund with higher fees such as the Kaufmann Fund may be providing disproportionate compensation for the lower fees and/or lower profitability of smaller mutual funds within the Federated Equity Fund Complex. This approach has precluded a specific determination that the Kaufmann Fund's investment advisory fees are in line with those that would be produced by informed arms-length

negotiations. CAC at ¶ ¶ 75-76.

Both before and following the reorganization of the Kaufmann Fund, the equity funds within the same trust had significantly lower advisory fees and total assets. The Federated Defendants typically have charged and continue to charge a substantially lower advisory fee of 0.75 percent of assets per annum to these funds, notwithstanding that the nature of the investment advisory functions and services provided virtually were/are identical to all the funds within the series. CAC at ¶ ¶ 78-81, 84. In 2007, the Federated Defendants were able to run five series of Federated Equity Funds with substantially lower total assets and more portfolio managers with investment advisory fees set at 0.75 percent per annum, which approximated 45 percent of what was charged for running the Kaufmann Fund, which is a single portfolio of securities that uses fewer portfolio managers. CAC at ¶ 86. From October 31, 2003, through October 31, 2007, the Kaufmann Fund generated the largest single investment fees for the Federated Defendants from a single domestic equity mutual fund, amounting to $53,265,731, $81,991,326, $96,344,877, $113,038,257 and $131,830,168 respectively. CAC at ¶ 88.

The Federated Defendants routinely offer their services to competing mutual funds through sub-advisory accounts that generate fees that are much lower than those charged to the Kaufmann Fund. These competing funds are the Principal Partners Large Cap Blend Fund, Inc., the WRL Federated Growth & Income Portfolio of the AEGON/Transamerica Series Fund, Inc., and the AST Federated Aggressive Growth Portfolio. CAC at ¶ 92. The fees charged to these funds are graduated on the cumulative amount of assets under management, dropping in percentage as the total assets reach certain threshold levels. CAC at ¶ 92. These "sub-advisory agreements are for the benefit of other publicly offered, registered investment companies, as is the Federated Kaufmann Fund, and these companies receive the same nature of investment advisory services as does the Kaufmann Fund." CAC at ¶ 93. Further, the average advisory fee charged to comparable, non-affiliated mutual funds by outside entities is less than half of the percentage charged the Kaufmann Fund. CAC at ¶ 95.

The Federated Kaufmann Fund generates large economies of scale in its investment operations.  CAC at ¶ 103.   Economies of scale were considered by the Trustees by evaluating the profitability and costs of the entire fund complex, but no fund-by-fund evaluation was undertaken. CAC at ¶ 106.  The investment advisory fee charged for the Federated Kaufmann Fund contains no breakpoints for increases in assets under management. CAC at ¶ 109.  The lack of breakpoints is in striking contrast with the prevailing practice in the mutual fund industry.  CAC at ¶ 109.  The high investment fee charged the Kaufmann Fund and the lack of breakpoints preclude the Kaufmann Fund from realizing any economies of scale generated by its large size. CAC at ¶ 110.  This arrangement indicates the Federated Defendants are reaping the benefit of economies of scale rather than passing them on to the Federated Kaufmann Fund.  CAC at ¶ 109.  The trustees have not given adequate consideration to the economies of scale generated by the Kaufmann Fund. CAC at ¶ 110.

The Kaufmann Fund has received very poor ratings regarding the quality of services it has received by a leading investment industry analyst, Morningstar. CAC at ¶ ¶ 68, 111.  It was only one of 34 funds receiving a failing overall "Stewardship Grade" of "F," which score is based on evaluations in five separate categories: Regulatory History, Board Quality, Manager Incentives, Fees and Corporate Culture. CAC at ¶ 111.   The Kaufmann Fund received low assessments in several of these categories, including a failing rating in fees.  CAC at ¶ 112.  Comparison of the performance of similar and related groups of funds indicates that the overall performance of the Kaufmann Fund has been realized or surpassed by similarly situated, related mutual funds with considerably lower fees and significantly lower total assets.  CAC at ¶ ¶ 115-116.

The Kaufmann Fund also has the highest expense ratio of all the 266 large open-ended funds evaluated by Morningstar, which funds are limited to those with $4.5 billion or more in assets. CAC at ¶ 118.  This ratio is after voluntary fee waivers are used to reduce operating expenses. CAC at ¶ 118.   The Federated Defendants manage other equity mutual funds at far

lower total expense ratios.  CAC at ¶ 119.

The combination of the high investment advisory fees charged to the Kaufmann Fund and the high expense fee cap have made the fund "the most profitable equity fund of all the Series that comprise Federated Equity Funds, and [] the most profitable equity mutual fund in the Federated Mutual Fund Complex."  CAC at ¶ 119.  This existing degree of profitability has not been adequately considered by the trustees during the annual review of advisory fee contracts.  CAC at ¶ 119.

As advocated by plaintiffs, these allegations are sufficient to support the following: the Kaufmann Fund's fees are high when compared to the fees Federated charges other similar funds and clients and industry norms.  It has the highest advisory fee of any fund in the Federated family of funds, notwithstanding that it is substantially larger than the other funds.  The fund's assets have grown from $3.2 billion to $11.8 billion between 2001 and 2007.  The fund's fees have more than double in the last four years available, 2003 to 2007, reflecting an increase from $53,265,731 to $131,830,168.  No effort has been made to pass along any economies of scale gained by the fund's exorbitant growth since 2001.  There are no breakpoints integrated into the fee structure charged to the fund. The fund has the highest total expense ratio of all large open-end funds in a leading industry analyst's database.

In comparison, the Federated Defendants have entered into sub-adviser arrangements in the open market that provide for advisory fees at substantially lower percentages of average net assets.  These agreements also implement breakpoints that are graduated to the total amount of funds under management.  The Federated Defendants thus are able to provide a comparable service on the open market for a fraction of the cost charged to the Kaufmann Fund.

The Kaufmann Fund has received advisory fee services that at best only fair as comparable to other funds within the Federated Equity Fund and similar outside funds.  At worst, those services are substandard by any measure.  A respectable industry analyst has rated the Federated Defendant's stewardship as well below that of acceptable services.

The Kaufmann Fund advisory fee investment contract is considered and approved by the Board collectively as part of a larger complex of performing funds. Individual consideration of the Kaufmann Fund's relationship in total assets, total fees, and the percentage of its contributions to the operations of the numerous other funds operated at considerably lower fees and expense ratios is not undertaken as part of the annual review and renewal of the fund's advisory fee contract. Nor is individual consideration given to the relationship between the amount of fees paid by the Kaufmann Fund and other specific comparable funds or the comparison of those fees with independent arrangements for similar services made in the open and competitive market.

A claim asserted under section 36(b) is to be evaluated by examining both the adviser's conduct during the process leading to the fee arrangement and the end result. Gallus, 561 F.3d at 823; Green, 286 F.3d at 686. Plaintiffs have alleged that the process leading to the fees charged to the Kaufmann Fund did not disclose meaningful and specific information needed to assess the relationship of the fees being charged to the services being provided. They have alleged that the fees charged are excessive under any relevant comparison. They have alleged that the services provided have not been of a quality or quantity that would justify the fee arrangement. They have alleged that the defendants have completely failed to pass along any economies of scale gained by the fund's growth over recent years through merger and otherwise and instead have consumed these saving for their own benefit or the benefit of other funds managed within the same complex of funds, a practice which section 36(b) was aimed at curtailing. See Migdal, 248 F.3d at 326-27 ( "Section 36(b) was enacted in large part because Congress recognized that as mutual funds grew larger, it became less expensive for investment advisers to provide the additional services. Congress wanted to ensure that investment advisers passed on to fund investors the savings that they realized from these economies of scale.") (citing Fogel v. Chestnutt, 668 F.2d 100, 111 (2d Cir.1981)).

A number of courts have upheld complaints founded on similar allegations. See Sins v.

Janus Capital Mgmnt., LLC, 2006 WL 3746130, *3-4 ( D. Colo. Dec. 15, 2006) (recognizing section 36(b) claim founded on similar allegations); Hunt v. Invesco Funds Group, Inc., 2006 WL 1581846, *2-5 (S.D. Tex. June 5, 2006) (allegations "sufficient to allege a disproportionality" between the fees charged and the services rendered coupled with comparisons with fees charged for "equivalent advisory services" sufficient to state a claim); Dumond v. Massachusetts Fin. Servs. Co., 2006 WL 149038, *1-3 (D. Mass. Jan. 19, 2006) (allegations of excessive distribution fees, the providing of similar services to institutional clients for substantially lower amounts, the payment of excessive commissions to broker-dealers in exchange for soft dollars and the failure to pass along economies of scale sufficient to state a claim); and Strigliabotti v. Franklin Resources, Inc., 2005 WL 645529, *3-4 (N.D. Cal. Mar. 7, 2005) (disproportion between fees and services rendered, significant increase in assets under management and failure to pass along economies of scale set forth viable section 36(b) claim). And contrary to defendants' efforts to characterize the allegations of the CAC as formulaic recitations of legal principles, assertions that lack meaning without proper context, or naked assertions incapable of further factual enhancement, plaintiffs' allegations are grounded in sufficient fact or are derived from concrete factual matter.  Standing unrebutted through expert testimony or otherwise, they are enough to "nudge" the section 36(b) claim  "across the line from conceivable to plausible," which is all that is required.  Iqbal, 129 S. Ct. at 1951. Consequently, defendants' motion properly has been denied.

                                              s/ David Stewart Cercone  
                                              David Stewart Cercone,  
                                              United States District Judge

cc:    All Counsel of Record