IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IN RE FEDERATED MUTUAL FUNDS   )   2:04cv352
EXCESSIVE FEE LITIGATION       )   Electronic Filing

## MEMORANDUM ORDER

AND NOW this 25th day of March, 2010, upon due consideration of the plaintiffs' Motion to Compel Production of Documents and Deposition Testimony, IT IS ORDERED that [140] the motion be, and the same hereby is, granted in part and denied in part. The motion is granted to the extent it seeks the production of communications, correspondence, documents, reports and data which consist of or reflect the factual information and historical events taken into account or otherwise considered or discussed in the undertakings leading to the production of Management Practices, Inc. ("MPI")'s report. Plaintiffs may discover the communications between Dickstein Shapiro and MPI and visa versa, and MPI and Federated personnel and visa versa, to the extent they involved or pertained to any such matters. The motion is denied to the extent it seeks the production of MPI's report, drafts of the report, and any interim analyses because such matters are protected by the work-product privilege; the motion is denied to the extent it seeks the communications between Dickstein Shapiro and MPI that expressly involved the substantive content of such reports, drafts or analyses because such communications are protected under the work-product and attorney-client privileges; and the motion is denied to the extent it seeks any communications by the independent trustees made in confidence to Dickstein Shapiro or MPI representatives to obtain the report or made in confidence to Dickstein Shapiro to receive or further understand any legal advice rendered as a result of the report.

I. Introduction

The parties' dispute centers around an expert report that was created at the request of third-party counsel for the Federated Family of Mutual Funds. Defendants claim the report and

the analyses therein were produced by a non-testifying expert and are protected under the attorney-client and work-product privileges. Plaintiffs maintain the report reflects a professional review and analyses that were undertaken and necessary for business purposes and the assertion of privilege improperly has been interjected to shield relevant information from discovery. For the reasons that follow, we find the report is protected by the work-product privilege and that privilege extends to those communications between the third-party counsel and MPI that expressly involved the substance of the report and the analyses therein (including all drafts and interim analyses) and any implications such matters might have on plaintiff's claims against the independent trustees.

This action consists of the consolidation of several actions that were filed in or transferred to this district. The causes of action and theories of recovery have undergone a number of revisions. See e.g. Amended Complaint of January 16, 2005 (Doc. No. 52), Amended Complaint of October 12, 2006 (Doc. No. 74), Order of Consolidation of June 6, 2008 (Doc. No. 119), and the Consolidated Amended Complaint of June 11, 2008 (Doc. No. 119). Similarly, the defendants named in the actions have varied over time. Id.; see also Zucker v. Federated Shareholders Services Co., et al., 2:06cv241. The individual trustees on Federated's Advisory Board were named as defendants until at least March 5, 2007. See Memorandum Order of March 5, 2007 (Doc. No.  in 2:06cv241).

As was previously noted in the disposition of defendants' most recent motion to dismiss, "[p]laintiffs' Consolidated Amended Complaint ("CAC") reflects a metamorphoses of the claims originally presented in the consolidated actions, with the phoenix emerging as a "pure excessive fee" case under section 36(b) of the Investment Company Act of 1940, 15 U.S.C. § 80a-1 et seq. ("the Act")." Memorandum Order of September 30, 2009 (Doc. No. 165) at 2. In the CAC plaintiffs allege and seek to establish that the advisory fee charged to the Federated Kaufmann Fund of 1.425 percent of average net assets per annum, which when reduced to a fee of approximately 1.275 percent of average net assets per annum after certain

voluntary expense waivers are instituted, is unreasonable, excessive and/or disproportionate to the services provided, is not indicative of the fee that would be produced by arm's-length bargaining, has not been produced from a fair process, and violates the provisions of Section 36(b) of the Investment Company Act of 1940. Id. at 5 (citing CAC at ¶ 5).

One of the factors that must be considered in adjudicating plaintiff's claim is Federated's profitability as it relates to the mutual fund in question. See Memorandum Order of September 30, 2009 (Doc. No. 165) at 5 (citing Gartenberg v. Merrill Lynch Asset Mgmnt., Inc., 694 F.2d 923, 928 2d Cir. 1982)). It is also a factor to be considered in deciding whether Federated has provided the trustees with the information necessary to evaluate properly the advisory fee paid by the fund. See 15 U.S.C. § 80a-15(c).

In December of 2005, Federated negotiated a settlement agreement (Assurance of Discontinuance) with the Attorney General of New York to resolve market-timing and late-trading claims. None of the independent trustees were a party to that agreement. The agreement required that Federated recommend to the trustees that they appoint a "Senior Officer" who would prepare an annual evaluation concerning the advisory fees that Federated charged. The annual evaluation had to include an analysis of Federated's profits on a fund-by-fund basis. Prior to this agreement, Federated had not performed such evaluations on a fund-by-fund basis, but instead analyzed profitability as to an entire group or family of funds. In filings with the SEC, the trustees indicated they believed such fund-by-fund analyses were of little use. See e.g., Federated Equity Funds, Form N-CSR – Certified Shareholder Report, (Dec. 29, 2005) ("Analyzing isolated funds would require constructed allocations of costs of shared resources and operations based on artificial assumptions that are inconsistent with the existing relationships within a large and diversified family of funds that receive advisory and other services from the same organization."). This belief was due, in part, to the "availability of the exchange privilege among funds in the Federated family . . . ." Id.

Federated recommended to the trustees that they appoint Brian Bouda, a Federated

employee, to the "Senior Officer" position. As Senior Officer, Bouda was to analyze Federated's advisory fees and profits on a fund-by-fund basis and submit his findings in a report. Despite Bouda's lack of accounting and cost allocation experience, the trustees appointed him.

In May of 2006, Bouda issued his first report. In the report he indicated that the fund-by-fund allocations were of "limited use" due to the "inherent difficulties in arbitrarily allocating costs . . . ." Bouda Report (Doc. No. 142) at 6; Evaluation and Approval of Advisory Contract (Doc. 143-1) at 16. In light of his belief that there would be an ongoing need to produce such analyses and that a number of individuals had serious reservations about the usefulness of the allocation process that had been devised and undertaken, he recommended to the trustees that they "have a review applied by an independent authority to confirm that the effort falls within the range of reasonableness." Bouda Report (Doc. No. 142) at 6.

The trustees did not immediately act upon Bouda's recommendation. Instead, they submitted it to Dickstein Shapiro LLP, third-party counsel ("counsel") to the Federated Family of Mutual Funds. In October of 2006, counsel engaged MPI, to "assist in providing legal advice to [their] client, the Independent Trustees of the Federated Funds with respect to the cost allocation methodology utilized by the Funds' Senior Officer pursuant to the Assurance of Discontinuance . . . ." MPI Engagement Letter of October 11, 2006 (Doc. No. 143-1).

MPI is a "market-focused strategic consulting firm, serving financial, industrial, service, and consumer organizations." http://www.mpiweb.com./. It has been an active advisor to mutual fund directors and their counsel since 1970. http://www.mpiweb.com/content/-blogcategory/21/75/. After finishing the review, MPI issued its findings in December of 2006 in a report to counsel. This report was treated as confidential and the only member of the independent trustees to be presented with the report was the Chairman, Dr. John Murray.

Plaintiffs seek to compel the production of the MPI report and all documents related to that report. They also seek to compel Federated and Dickstein Shapiro to answer deposition

questions related to the report. Defendants assert the attorney-client and work-product privileges.

II. Applicability of the Work Product Doctrine

The work-product doctrine is codified in Federal Rule of Civil Procedure 26(b), which provides that "a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial" unless otherwise discoverable or the party shows substantial need for the material. Fed. R. Civ. Proc. 26(b)(3). In the seminal case of Hickman v. Taylor, 329 U.S. 495 (1947), the Supreme Court first recognized the doctrine pursuant to the principle that permitting attorneys to prepare their cases without fear that their work product would be used against their clients advances the adversarial system. Id. at 510-11. In United States v. Nobles, 422 U.S. 225, 238 (1975), the Supreme Court further opined that the doctrine "shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case." Included within this category are trial preparation documents that reflect the fruits of the attorney's endeavors, any compendium of evidence prepared by the attorney and any of the attorney's mental impressions, opinions or theories. Id. at 236-39. Also protected are those materials prepared by an attorney's agent. Id. at 238-39.

The work-product doctrine "is designed to protect material prepared by an attorney acting for his client in anticipation of litigation." United States v. Rockwell Intern., 897 F.2d 1255, 1265 (3d Cir.1990). A document is considered to be prepared "in anticipation of litigation [when] in light of the nature of the document and the factual situation in the particular case, the document can be fairly said to have been prepared or obtained because of the prospect of litigation." In re Grand Jury Proceedings, 604 F.2d 798, 803 (3d Cir.1979). In contrast, the doctrine does not protect documents prepared "in the ordinary course of business, or pursuant to public requirements unrelated to litigation, or for other nonlitigation purposes." Martin v. Bally's Park Place Hotel & Casino, 983 F.2d 1252, 1260 (3d Cir.1993). The fact that the documents sought for discovery do not include legal advice is, "as a matter of law, irrelevant

provided ... they were prepared in anticipation of litigation." Montgomery County v. MicroVote Corp., 175 F.3d 296, 305 (3d Cir. 1999) (quoting In re Ford Motor Co., 110 F.3d 954, 968 (3d Cir.1997)).

The party seeking the protection has the burden of proving the doctrine applies. Conoco, Inc. v. U.S. Dep't of Justice, 687 F.2d 724, 730 (3d Cir.1982). Once that burden has been met, protected work product is "afforded near absolute protection from discovery." In rep Cendant Corp. Sec. Litig., 343 F.3d 658, 663 (3d Cir. 2003). A limited exception exists where the party seeking disclosure can demonstrate a substantial need for the material and the inability without undue hardship to obtain the substantial equivalent of it by other means. Fed. R. Civ. P. 26(b)(3).

During a period when claims were still pending against the independent trustees, the trustees referred Bouda's recommendation to counsel for further consideration. Counsel believed it necessary to hire MPI to evaluate the allocation and methodology that had been used by Federated in its first fund-by-fund profitability analyses. These allocations had been perceived by the trustees to be of little use to their review of the annual contracts for advisory services. The Senior Officer had noted that the allocations and analyses would be repeatedly undertaken and considered in the future. From a business perspective, the allocation and resulting report had been completed and the trustees were on record as giving little to no weight to the undertaking. Thus, the business use for such review and evaluation was at best minimal.

In contrast, counsel needed further insight into any impact or repercussions that Bouda's allocations and methodologies might have on the pending claims against its clients, which included the independent trustees, and more importantly, whether continuing to employ those allocations and methodologies could potentially subject its clients to additional claims in the litigation or create other exposure to liability. The MPI report would have been important in forming the attorney's legal position and theories on the claims alleged by plaintiffs and the potential claims that might arise when each new annual advisory contract was made. Thus,

-6-

although the report was not legal in nature, its value to counsel in formulating ongoing legal strategy and providing future advice regarding plaintiff's existing and potential claims readily is apparent.

Furthermore, although a business purpose can be ascribed to the report, that does not automatically eliminate it from work-product protection. The focus is on the purpose for which the report was created. See e.g. United States v. Adlman, 134 F.3d 1194, 1202 (2d Cir. 1998) ("The formulation of the work-product rule used by the Wright & Miller treatise, and cited by the Third, Fourth, Seventh, Eighth and D.C. Circuits, is that documents should be deemed prepared 'in anticipation of litigation,' and thus within the scope of the Rule, if 'in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation.'") (citing and collecting authority in support)). And given that counsel's clients were on record as not employing such an analysis in their approval of annual advisory fee contracts because they found such analyses were of little use, elevating that business purpose to a level that would equal or surpass the legal purpose for the document's creation would be a distortion of the clear import of the inferences raised by the historical facts. It follows that MPI's report is protected by the work-product privilege.[1]

---

[1] The record contains information suggesting that the content of MPI's report was disclosed to plaintiff's counsel pursuant to a confidentiality and non-use agreement. See Plaintiffs' Motion to Compel, Exhibit E (Doc. No. 140-6) at 2. Such disclosure would destroy any attorney-client or work-product privilege that attached unless it can be shown that the disclosure was necessary to further the fundamental goals underlying each privilege. The Third Circuit has explained:

> We hold that Westinghouse's disclosure of work product to the SEC and to the DOJ waived the work-product doctrine as against all other adversaries. As we explained at page 1424, parties who have disclosed materials protected by the attorney-client privilege may preserve the privilege when the disclosure was necessary to further the goal underlying the privilege. We require the same showing of relationship to the underlying goal when a party discloses documents protected by the work-product doctrine. In other words, a party who discloses

Moreover, plaintiffs have failed to show either a substantial need for the information or an inability to obtain the substantial equivalent of the material through other means. Plaintiffs already have Bouda'a report. They either have or have the ability to discover all underlying data and information that was considered by Bouda in formulating his report. There has been no showing that an expert providing services similar to MPI is not available to plaintiffs. It follows that the MPI report was produced in anticipation of litigation and is undiscoverable work-product.

Drafts, interim reports and analyses, and communications between counsel and MPI expressly involving the substantive content of such reports, drafts or analyses likewise are protected work-product. Permitting discovery into such matters would be tantamount to disclosure of the attorney's work-product, thought processes and legal strategies. Cf. In re Cendant Corp. Securities Litigation, 343 F.3d 658, 662 (3d Cir. 2003) ("It is clear from Hickman that work product protection extends to both tangible and intangible work product.").

In contrast, the documents provided as part of MPI's review cannot be afforded this same protection because they are not the fruits of counsel's efforts nor do they reflect counsel's legal theories, mental processes, thoughts and strategies. Underlying communications and correspondences, documents, and reports which relate to factual matters and historic events also are discoverable so long as they do not disclose the content of the report or the narrow

---

    documents protected by the work-product doctrine may continue to assert the
    doctrine's protection only when the disclosure furthers the doctrine's underlying
    goal.

Westinghouse Elec. Corp. v. Republic of Philippines, 951 F.2d 1414, 1429 (3d Cir. 1991); see also United States v. Massachusetts Institute of Technology, 129 F.3d 681, 687 (1st Cir., 1997) (same); Jones v. Nationwide Mut. Fire Ins. Co., 2010 WL 181753, * 2 (M.D. Pa. Jan 12, 2010) (same).

scope of communications otherwise protected by the privilege (or can be redacted to do so).

The same communications protected by the work-product privilege are protected by the attorney-client privilege. Federal Rule of Evidence 501 provides: "the privilege of a witness . . . shall be governed by the principles of the common law as they may be interpreted by the courts of the United States." Federal courts have long recognized the attorney-client privilege as "one of the oldest of the privileges for confidential communications known to the common law." Upjohn v. United States, 449 U.S. 383, 389 (1981).

The showing necessary to establish the attorney-client privilege is settled:

> (1) (When) legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his insistence permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived.

In re Grand Jury, 603 F.2d 469, 474 (3d Cir.1979) (citing J. Wigmore, EVIDENCE § 2292 at 554 (1961)); see also In re Impounded, 241 F.3d 308, 316 n. 6 (3d Cir. 2001). "The burden of proving that the (attorney-client) privilege applies is placed upon the party asserting the privilege." In re Grand Jury, 603 F.2d at 474 (citing among other cases United States v. Landof, 591 F.2d 36, 38 (9th Cir.1978)).

The attorney-client privilege serves laudable purposes and thus is "[w]orthy of maximum protection." Haines v. Liggett Group Inc., 975 F.2d 81, 90 (3d Cir.1992). Nevertheless, the privilege obstructs the truth-finding process and is to be construed narrowly. Westinghouse Elec. Corp. v. Republic of Philippines, 951 F.2d 1414, 1423 (3d Cir. 1991). The privilege "protects only those disclosures – necessary to obtain informed legal advice – which might not have been made absent the privilege." Id. (citing Fisher v. United States, 425 U.S. 391, 403 (1976)).

When disclosure to a third party is necessary to receive informed legal advice, "courts have held that the client may allow disclosure to an 'agent' assisting the attorney in giving legal advice to the client without waiving the privilege." Westinghouse, 951 F.2d at 1423. In United

States v. Kovel, 296 F.2d 918 (2d Cir. 1961), the Second Circuit held that, because "the complexities of modern existence prevent attorneys from effectively handling clients' affairs without the help of others," the attorney-client "'privilege must include all the persons who act as the attorney's agents.'" Id. at 921 (quoting 8 Wigmore, Evidence, § 2301)

In Kovel, the court analogized the situation of an attorney hiring an accountant to aid in the attorney's understanding of accounting concepts to that of an attorney hiring an interpreter to understand his foreign language speaking client. Id. at 922. This same logic can be applied to situations where an attorney contacts a mutual fund consulting firm in order to aid in his understanding of the complexities of a fund profit and cost analyses. This is especially true when these analyses implicate issues in pending litigation. But that protection can extend only as far as the confidential communications, anything further would impede the truth-finding process.

While facing a lawsuit alleging breach of fiduciary duty for approval of advisory fee and related contracts, MPI was specifically retained by counsel in order to get an expert opinion on whether the allocations and methodology used by Federated in analyzing fund-by-fund profitability fell within the range of reasonableness. The communications between counsel and MPI, and between counsel's clients for which the privilege has been invoked – the independent trustees – , concerning the content of the report and its potential impact on the pending claims implicating the independent trustees or potential claims against them due to the substantive import of the report would be protected by the privilege.

But any effort by defendants to invoke the attorney-client privilege beyond the protections outlined above is misplaced. The privilege protects communications between a client and lawyer to "encourage clients to make full disclosure" because "sound legal advice depends upon the lawyer's being fully informed by the client." Fisher, 425 U.S. at 403. Here, there is no basis to assume that the client for which the privilege has been invoked, the independent trustees, initiated communications about obtaining the MPI report beyond

-10-

referring the matter to counsel for its determination of whether further analyses was in their legal interest under the circumstances.  Furthermore, there is no indication that the trustees had actual conversations with MPI representatives.[2]

Similarly, all underlying information and data gathered by MPI as part of its undertaking would be discoverable.  "[T]he protection of the privilege extends only to communications and not to facts.  A fact is one thing and a communication concerning that fact is an entirely different thing.  The client cannot be compelled to answer the question, 'What did you say or write to the attorney?' but may not refuse to disclose any relevant fact within his knowledge merely because he incorporated a statement of such fact into his communication to his attorney." Upjohn Co. v. United States, 449 U.S. 383, 395-96, (1981) (quoting Philadelphia v. Westinghouse Electric Corp., 205 F. Supp. 830, 831 (E.D. Pa. 1962)). In other words, communications made in confidence by the independent trustees to MPI that expressly sought to gain informed legal advice would be protected by the attorney-client privilege.  And any communications made in confidence between counsel and Dr. Murray (the only independent trustee to receive MPI's report) about the report and its implications would be protected.  This privilege does not, however, protect communications which were not made in confidence by the actual client or predicated on gaining informed legal advice.  Nor would the privilege concerning confidential communications extend to the sea of data used by MPI and any other information regarding the historical events and underlying facts that were considered in arriving at the content of the report.  The attorney-client privilege cannot be used to shield business information and transactions that would otherwise be discoverable.

IV. Applicability of a Fiduciary Exception

In a shareholder class action suit against a corporation, the United States Court of Appeals for the Fifth Circuit held that legal advice given to corporate managers by corporate

---

[2]Of course, discussions with Bouda and other personnel of Federated would not be communications made "by the client" in confidence in order to obtain requested legal advise.

counsel for the benefit of the corporation was not privileged. Garner v. Wolfinbarger, 430 F.2d 1093 (5th Cir.1970). The court reasoned that due to the fiduciary's lack of personal interest in the legal advice, the advice was discoverable. Id. at 1101. In analyzing Garner, the Third Circuit has recognized that "[w]hen a legitimate personal interest does emerge – such as when a corporate manager is sued by shareholders – the manager then becomes entitled to legal advice which is not discoverable by the shareholders." Wachtel v. Health Net, Inc., 482 F.3d 225, 232 (3d. Cir. 2007) (holding that the fiduciary exception does not apply to ERISA suits).[3]

The legal advice sought by the independent trustees was predicated on the pending litigation against them. The trustees were confronted with a lawsuit that challenged the approval of advisory fees and related contracts and arrangements for services to the funds. The allegations involved a legitimate personal interest concerning potential liability for excessive advisory fees and related arrangements for management services. The legal analysis sought and obtained pertained to the implications of the allocations and methodology employed in the first fund-by-fund profitability analysis conducted by Federated for consideration by trustees and its implication on the claims and potential claims against the independent trustees in the on-going litigation. It cannot be said that the legal advice was for the benefit of the shareholders or for the benefit of the fund. The beneficiaries of the legal advice were the independent trustees. It follows that the legal advice was sought for personal interests and the fiduciary exception invoked by plaintiffs does not apply.

V. Conclusion

The MPI report is protected from discovery under the work-product doctrine. The report was a result of the attorney's endeavors and aided in the formation of legal theories, strategies and ongoing advice. Plaintiffs have not shown a substantial need for the document or an inability to obtain the substantial equivalent of the material through other means. Both the

---

[3]One district court has rejected the reasoning in Garner outright. See Lefkowitz v. Duquesne Light Co., 1988 WL 169273 (W.D. Pa. 1988).

work-product and the attorney-client privilege protect those communications from the independent trustees to counsel that were made in confidence, from the attorney to his agent that expressly involved the content of the report, and from client to the attorney in receiving and understanding the informed legal advice. The privilege does not protect any underlying facts events, and historic information simply because they were conveyed to counsel or its agent.

s/ David Stewart Cercone  
David Stewart Cercone,  
United States District Judge

cc:     All Counsel of Record